[Cite as *State v. Smith*, 2023-Ohio-3015.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE/                    **CASE NO. 14-22-16**
    CROSS-APPELLANT,

    v.

RICHARD ALLEN SMITH, JR.,

                                   **O P I N I O N**
    DEFENDANT-APPELLANT/
    CROSS-APPELLEE.

**Appeal from Union County Common Pleas Court**
**Trial Court No. 2021-CR-0134**

**Judgment Affirmed in Part, Reversed in Part, and Cause Remanded**

**Date of Decision: August 28, 2023**

APPEARANCES:

    *Kyle Phillips* and *Rocky Ratliff* for Appellant/Cross-Appellee

    *Andrew M. Bigler* and *Samantha Hobbs* for Cross-Appellant/Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant, cross-appellee Richard A. Smith, Jr. ("Richard") appeals the judgment of the Union County Court of Common Pleas, arguing that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence; that the trial court gave erroneous jury instructions on self-defense; that the trial court erred by admitting other acts evidence; and that the trial court erred by granting the State's motions in limine.

{¶2} The State of Ohio as plaintiff-appellee, cross-appellant appeals the judgment of the Union County Court of Common Pleas, arguing that the trial court erred by imposing a sentence for only one of Richard's firearm specifications. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

{¶3} At roughly 5:02 P.M. on July 11, 2021, Trooper Daniel Z. Voght ("Trooper Voght") of Ohio State Highway Patrol went to a location on State Route 37 where a car had reportedly crashed in a field. Richard was the driver of the wrecked vehicle. He indicated that he had missed a stop sign and drove into the field. No other vehicles were involved in this accident, but the only passenger in Richard's vehicle, Curtis Slone ("Curtis"), sustained an injury to his head in the crash. Curtis was Richard's cousin.

{¶4} Trooper Voght detected the odor of an alcoholic beverage coming from Richard and noticed that he was unsteady on his feet. A bottle of black velvet was also located in the vehicle. Trooper Voght then had Richard perform several field sobriety tests after which Richard was placed under arrest for operating a vehicle impaired. Curtis contacted a relative to secure a ride home. In response, Richard's daughter, Tiara Smith ("Tiara"), drove with Richard's nephew, Timothy Smith ("Timothy"), to the scene of the accident. Richard was released to Tiara from police custody at 6:30 P.M.

{¶5} A tow truck came to transport the wrecked vehicle back to the house where Richard lived with his mother, Martha Smith ("Martha"), and Timothy. Curtis was unsteady on his feet due to a preexisting health condition and had to be helped into the car that Timothy and Tiara had brought to the scene of the accident. Curtis's head was cut and bleeding. Curtis, Timothy, Tiara, and Richard then drove together back to Curtis's house, which was located a few doors down from where Richard lived.

{¶6} Timothy was upset with Richard for getting into an accident that injured Curtis. On the ride to Curtis's house, Timothy expressed his frustrations to Richard. Timothy later testified that he was upset because did not believe that Richard was showing any remorse for his actions. Timothy further explained that the vehicle that was wrecked in the accident had belonged to Richard's father and, for this reason, had sentimental value to the family.

{¶7} After arriving at Curtis's home, Richard got out of the vehicle and walked down the street to his house so that he could receive the wrecked vehicle from the tow truck. Timothy initially indicated that he was going to take a walk but ended up helping Curtis into his house. Inside, Timothy began tending to Curtis's bleeding head wound. After the tow truck arrived where Richard lived, Richard grabbed a nine-millimeter handgun out of the wrecked vehicle. He then put this handgun in his pocket and grabbed a twenty-two-caliber rifle from inside his house before he began walking back towards Curtis's house.

{¶8} On his arrival, Richard then walked up a ramp outside of Curtis's door and went inside. Once inside, Richard saw Timothy tending to Curtis's wound and trying to talk Curtis into seeking medical treatment at the hospital. Jimmie Slone ("Jimmie"), who is Curtis's brother, was also sitting in the room. Jimmie testified that Richard told Timothy that Curtis did not need to be "babied." (Mar. 28 Tr. 122). At this point, Timothy and Richard began to argue.

{¶9} Timothy later testified that, at this point, he "challenged him [Richard] to go outside," saying he "wanted to fight him." (Mar. 29 Tr. 124). He stated that Richard went outside in response to this challenge and that he then followed Richard out the door. However, Richard testified that he walked outside to finish his cigarette, leaving the house after Timothy had gone outside. He further stated that he did not agree to fight Timothy. Jimmie testified that Timothy went outside first, but he did not know why Timothy or Richard left the house.

{¶10} Timothy testified that, once they were outside, he "told him [Richard] to put his hands up." (Mar. 29 Tr. 145). He testified that Richard then put his hands up. Timothy then shoved Richard. From inside the house, Jimmie could see Richard's "head going by the window" as he stumbled backwards and fell to the ground. (Mar. 29 Tr. 124). While he was still lying on the ground, Richard drew the handgun out of his pocket and shot Timothy in the stomach.

{¶11} When he heard the gunshot, Jimmie jumped out of his chair and went outside. Jimmie then took the handgun away from Richard while he was still on the ground and called 9-1-1. Timothy testified that he told Richard that he "killed" him. (Mar. 29 Tr. 131). He testified that, in response, Richard said, "bye. I don't care," as he walked back into the house. (Mar. 29 Tr. 131). Richard also told Jimmie, "I shot the motherf**ker." (Mar. 28 Tr. 132). After Richard went into the house, he grabbed his rifle and tried to leave. However, Jimmie took the rifle away from him. Richard's relatives prevented him from returning to his home and kept him on the premises.

{¶12} Timothy testified that he believed that he was going to die. He stated that he tried to call his daughter on his cell phone but his hands were too "shaky" to manipulate his phone. (Mar. 29 Tr. 127). One of his relatives then got him a chair. Shortly thereafter, the police arrived at the house and secured the scene. At that time, Timothy was sitting in a chair outside. He was ultimately transported via helicopter to a hospital where he underwent surgery. Timothy spent roughly three

weeks in the hospital recovering from this procedure. The police recovered two guns from the scene and took Richard into custody.

{¶13} On July 15, 2021, Richard was indicted on one count of attempted murder in violation of R.C. 2923.02(A), a felony of the first degree; two counts of felonious assault in violation of R.C. 2903.11(A)(1), felonies of the second degree; one count of aggravated assault in violation of R.C. 2903.12(A)(2), a felony of the fourth degree; one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree; one count of having weapons while under disability in violation of R.C. 2923.13(A)(4), a felony of the third degree; and one count of using weapons while intoxicated in violation of R.C. 2923.15(A), a misdemeanor of the first degree. The first five of these counts were charged with three-year firearm specifications under R.C. 2941.145(A).

{¶14} A jury trial was held from March 28 to 30, 2022. Both Richard and Timothy testified as witnesses. During this proceeding, the trial court granted the State's motion to dismiss the count of aggravated assault. The jurors could not reach a verdict on the charge of having weapons under a disability. For this reason, the trial court declared a mistrial on this charge. The jury returned verdicts of guilty on the remaining five charges and the four associated gun specifications.

{¶15} At sentencing, the trial court concluded that Richard's convictions for felonious assault merged with his convictions for domestic violence and attempted murder. The State elected to proceed to sentencing on the conviction for attempted

murder. The trial court then imposed sentences for attempted murder, for using weapons while intoxicated, and for one three-year firearm specification.

{¶16} Richard filed his notice of appeal on June 28, 2022. On appeal, he raises the following assignments of error:

### First Assignment of Error

**The trial court erred to the prejudice of defendant-appellant Richard Allen Smith Jr. by finding defendant-appellant did not act in self defense as those verdicts were against the manifest weight of the evidence and insufficient as a matter of law to support those verdicts.**

### Second Assignment of Error

**The trial court erred to the prejudice of defendant-appellant Richard Allen Smith Jr. when the court incorrectly instructed the jury on the elements of self defense.**

### Third Assignment of Error

**The trial court erred as a matter of law to the substantial prejudice of defendant-appellant Richard Allen Smith Jr. by allowing evidence to be admitted regarding field sobriety tests taken by defendant-appellant in another incident over two (2) hours before this incident occurred.**

### Fourth Assignment of Error

**The trial court erred as a matter of law to the substantial prejudice of defendant-appellant Richard Allen Smith Jr. when it granted plaintiff-appellee's motions in limine without conducting a hearing or permitting defendant-appellant an opportunity to respond, which limited defendant-appellant from presenting taped phone call evidence.**

On July 1, 2022, the State of Ohio filed notice of cross-appeal. The State raises the following assignment of error:

**The trial court erred when it only imposed a sentence for one firearm specification.**

*First Assignment of Error*

{¶17} First, Richard asserts that his conviction for attempted murder is not supported by sufficient evidence and is against the manifest weight of the evidence. Second, he argues that the jury's determination that he did not act in self-defense is against the manifest weight of the evidence. We will examine these arguments in two separate analyses.

Legal Standard

{¶18} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 16 (3d Dist.), quoting *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002-Ohio-1276, ¶ 19. This "analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

**{¶19}** An appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). On appeal, the applicable standard

> is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

**{¶20}** The manifest weight of the evidence analysis examines whether the State has carried its burden of persuasion at trial. *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 58 (3d Dist.), citing *Richey*, *supra*, at ¶ 29. In this process, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 12, quoting *Plott* at ¶ 73.

**{¶21}** For this reason, an "appellate court sits as a 'thirteenth juror' * * *." *State v. Elliott*, 2022-Ohio-3778, 199 N.E.3d 944, ¶ 19 (3d Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 388, 1997-Ohio-52, 678 N.E.2d 541, 547 (1997).

> Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *Thompkins* at 387, 678 N.E.2d 541.

**{¶22}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis for Attempted Murder Conviction

**{¶23}** In this case, Richard was convicted of the charge of attempted murder. In order to establish the crime of attempted murder, the State needs to prove that the

defendant "purposely" attempted to "cause the death of another."  R.C. 2903.02(A);

R.C. 2923.02(A).  The Ohio Revised Code provides that

> [a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22.  Further "[i]t is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978).

**{¶24}** "[A] firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death * * *." *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025, 1028 (1982).  "'[I]n an attempted-murder prosecution, a defendant's specific intent to kill another can be inferred from the defendant's shooting in the victim's direction' and is strongly corroborative of criminal purpose." *State v. Dwyer*, 2d Dist. Greene No. 2021-CA-16, 2022-Ohio-490, ¶ 20, quoting *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 17-18.  *State v. Chisholm*, 8th Dist. Cuyahoga No. 111364, 2023-Ohio-604, ¶ 52 (firing a gun at another person is an act that carries "death as a natural and probable consequence"), quoting *State v. Brown*, 8th Dist. Cuyahoga No. 68761, 1996 WL 86627 (Feb. 29, 1996).

{¶25} Richard argues the State failed to produce evidence that establishes he acted with an intent to kill. However, at trial, Timothy testified that Richard pulled out a pistol; pointed the gun at him; and fired at him without warning. Richard later admitted that he fired the gun at Timothy, though he argued that he acted in self-defense. *State v. Hubbard*, 150 Ohio App.3d 623, 2002-Ohio-6904, 782 N.E.2d 674, ¶ 59 (7th Dist.).

{¶26} Further, the testimony indicates that Richard was a short distance away from Timothy. *See State v. Cotton*, 2015-Ohio-5419, 55 N.E.3d 573, ¶ 15 (8th Dist.) (considering that fact that the defendant fired a gun at the victim "at nearly point-blank range" in concluding sufficient evidence existed for an attempted murder charge). Timothy testified that he was struck in the stomach and ultimately had to be life-flighted to the hospital for an emergency surgery. *See State v. Winegarner*, 2023-Ohio-319, 208 N.E.3d 88, ¶ (8th Dist.) (considering the fact that the victim "suffered a life-threatening injury" in concluding that an attempted murder conviction was supported by sufficient evidence).

{¶27} Jimmie testified that, after the shooting, Richard said, "I shot the motherf\*\*ker." (Mar. 28 Tr. 132). Curtis also identified a recording in which he reported that Richard had said, "I shot the motherf\*\*ker." (Tr. 48). Timothy testified that he believed that he was going to die after being shot and tried to call his daughter to say goodbye. He then told Richard that he had "killed" him. (Mar. 30 Tr. 130). Timothy testified that, in response, Richard said, "bye. I don't care."

(Mar. 30 Tr. 131). At trial, the State introduced the nine-millimeter handgun that was recovered at the scene. *See State v. Jones*, 5th Dist. Stark Nos. 2007-CA-00041, 2007-CA-00077, 2008-Ohio-1068, ¶ 28 (considering the caliber of the firearm in determining whether the evidence at trial demonstrated an intent to kill).

{¶28} From the evidence produced at trial, a reasonable trier of fact could infer that Richard acted with the requisite intent to support an attempted murder charge. Having examined the evidence in a light most favorable to the prosecution, we conclude that the State presented sufficient evidence to establish the intent element of this charged offense. This first argument is, therefore, without merit. We now proceed to examine the manifest weight argument that Richard has raised against his conviction for attempted murder.

{¶29} Richard argues that the jury's conclusion that he acted with the intent to kill was against the manifest weight of the evidence. At trial, Richard testified that he did not attempt to cause Timothy's death when he fired the gun. Rather, he testified that he just wanted to stop Timothy from hurting him. But the jurors, as the trier of fact, were free to believe or disbelieve Richard's testimony as to his intentions. *State v. McWay*, 3d Dist. No. 1-17-42, 2018-Ohio-3618, ¶ 22; *State v. Patterson*, 8th Dist. Cuyahoga No. 39479, 1980 WL 354335, *2 (Feb. 7, 1980) ("It was the province of the jury to believe or disbelieve defendant's version of the incident.").

**{¶30}** Further, on appeal, Richard also points to the fact that he only fired one shot at Timothy, even though he had the means and opportunity to fire multiple shots, to argue that he did not intend to kill Timothy. However, as the trier of fact, the jurors could still "construe the intention to shoot as proof of an intention to kill." *State v. Smith*, 89 Ohio App.3d 497, 501, 624 N.E.2d 1114, 1116 (10th Dist.) (considering a case in which the evidence established the defendant fired "at least one shot").

**{¶31}** Having examined these arguments, we conclude that Richard has not established that the evidence in the record weighs heavily against his conviction. The record contains no indication that the jurors, in reaching the conclusion that Richard acted with the intent to kill, lost their way and returned a verdict against the manifest weight of the evidence. Accordingly, the manifest weight arguments that Richard raises against his conviction for attempted murder are without merit. We turn now to examining his self-defense arguments.

Legal Analysis for Self-Defense

**{¶32}** On appeal, Richard also argues that the State failed to carry the burden of persuasion on self-defense. Under current Ohio law,

> [t]he defendant has the initial burden of production, which is the burden of producing evidence 'that tends to support' that the defendant used the force in self-defense. The burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense.

*State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 18 (8th Dist.). The

elements for self-defense by use of deadly force are as follow:

> (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he or she was in danger of death or great bodily harm and that the only way to escape was the use of force, and (3) the defendant did not violate any duty to retreat.

*State v. Barker*, 2022-Ohio-3756, 199 N.E.3d 626, ¶ 22 (2d Dist.). The State must

"disprove at least one of the elements of self-defense beyond a reasonable doubt."

*State v. Cervantes*, 3d Dist. Henry No. 7-21-06, 2022-Ohio-2536, ¶ 59, quoting *State*

*v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

{¶33} As to the first element, "[i]t is well established that a person cannot

provoke a fight or voluntarily enter combat and then claim self-defense." *State v.*

*Canankamp*, 3d Dist. Auglaize No. 2-22-02, 2023-Ohio-43, ¶ 38, quoting *State v.*

*James*, 2d Dist. Montgomery No. 28892, 2021-Ohio-1112, ¶ 21. "The second

element of a self-defense claim is a combined subjective and objective test." *State*

*v. Hunt*, 8th Dist. Cuyahoga No. 111892, 2023-Ohio-1977, ¶ 26, citing *State v.*

*Thomas*, 77 Ohio St.3d 323, 330, 1997-Ohio-269, 673 N.E.2d 1339, 1345 (1997).

Thus, "self-defense 'is placed on the grounds of the bona fides of defendant's belief,

and reasonableness therefor, and whether, under the circumstances, he exercised a

careful and proper use of his own faculties.'" *Thomas* at 1345, quoting *State v.*

*Sheets*, 115 Ohio St. 308, 310, 152 N.E. 664 (1926).

**{¶34}** "Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack." *State v. Ray*, 12th Dist. Butler No. CA2012-10-213, 2013-Ohio-3671, ¶ 30, quoting *State v. Bundy*, 4th Dist. Pike No. 11CA818, 2012-Ohio-3934, ¶ 55. This "requires consideration of the force that was used in relation to the danger the accused believed he was in.  * * *  In both deadly and non-deadly force cases, '[i]f the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable.'" *State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 24, quoting *Barker, supra,* at ¶ 27.

**{¶35}** At trial, the State argued that Richard was at fault in creating the altercation in this case.  After the car accident, Richard was given a ride to Curtis's house.  Timothy was in the vehicle and repeatedly verbalized his frustrations with Richard's decision to drive while intoxicated.  Timothy testified that he was upset because he believed that Richard's behavior caused Curtis's injuries and wrecked a vehicle that had belonged to Timothy's late grandfather.  He also felt that Richard had expressed no remorse over what had happened to Curtis.  Timothy testified that he "said a lot of things" to Richard on this drive.  (Mar. 29 Tr. 119).

**{¶36}** Richard testified that, when he arrived at Curtis's house, he did not remain at that location but walked down the street to his house where he obtained a loaded gun and then walked back to Curtis's house.  Richard stated that he took this gun to Curtis's house because he wanted to trade guns.  However, he also admitted that the gun was not his and belonged to his mother, Martha.  Richard entered the

-16-

residence and saw Timothy tending to Curtis's wound. Knowing that Timothy was upset with him, Richard reportedly told Timothy that he did not need to "bab[y]" Curtis by tending to his bleeding head wound. (Mar. 28 Tr. 11). This comment was directly related to the frustrations that Timothy had verbalized during the car ride. Timothy testified that he and Richard then began to argue.

{¶37} Richard testified that he was afraid of Timothy because of his violent past. He not only detailed incidents from Timothy's past but further stated that Timothy regularly "threatens to crack [his] * * * skull" during their arguments. (Mar. 30 Tr. 29). The Defense produced evidence from several witnesses that Timothy was quick-tempered, scary, violent, and unpredictable. However, during cross-examination, Richard did not provide an explanation as to why he remained at Curtis's house if he was afraid of Timothy when he knew that Timothy was angry at him. Richard also had no explanation for why he would then make comments that were likely to stoke Timothy's anger at him.

{¶38} Further, Timothy testified that he challenged Richard to a fight after Richard made his comments, telling Richard that they were going to take this disagreement outside. He stated that Richard accepted the challenge and walked out the door first. Timothy stated that he then went outside where he told Richard to put his hands up. Richard disputes this version of events, stating that he went outside to finish his cigarette and did not consent to a fight. He testified that he went outside after Timothy had left the house. Richard stated that, when he got outside,

Timothy pushed him to the ground. Timothy testified that he was not aware that Richard had a handgun in his pocket until he pulled the weapon out and fired a shot. Timothy stated that, if he had known that Richard had a gun, the altercation "wouldn't have gotten that far." (Mar. 29 Tr. 126).

{¶39} The State presented some evidence that indicated Richard went into the house where Timothy was located with a loaded gun concealed in his pocket and made comments related to a point of contention between them that were likely to arouse Timothy's anger. *See State v. Eichelbrenner*, 1st Dist. Hamilton No. C-110431, 2013-Ohio-1194, ¶ 26. While Richard and Timothy offered conflicting testimony on this point, the jury was free to believe whichever testimony it found to be more credible. *State v. Coleman*, 3d Dist. Logan No. 8-17-15, 2018-Ohio-1681, ¶ 44. From this evidence, the jurors could have concluded that Richard was at fault in creating the situation that gave rise to the shooting.

{¶40} At trial, the State also argued that Richard used disproportionate force in response to Timothy. The testimony at trial indicates that, once outside, Timothy pushed Richard to the ground. Timothy testified that he did not intend to seriously hurt Richard and only wanted to settle their argument. But Richard testified that he thought Timothy was going to beat him and that Timothy "said he was going to crack my skull." (Mar. 30 Tr. 51). During cross-examination, the prosecution noted that Richard did not tell the police about Timothy's threat immediately after the

shooting. Deputy Mitchell testified that Richard said only that Timothy "shoved him down so he shot him" and did not mention being afraid. (Mar. 30 Tr. 182).

{¶41} After being pushed, Richard fell to the ground. Timothy testified that Richard pulled out a handgun while still on the ground and fired at him without any warning. The record does not contain any evidence that Timothy was in possession of any kind of weapon at this time. At trial, Richard admitted that he did not see any gun or weapon in Timothy's possession. He testified that was afraid because Timothy was bigger, stronger, and younger than he was. However, Richard also affirmed that, after he was pushed, he was not "going to take it anymore." (Mar. 30 Tr. 83-84).

{¶42} Richard stated that he did not remember telling Timothy to "die" after he shot him. (Mar. 30 Tr. 92). He also stated he did not remember telling his relatives, "I shot the motherf**ker." (Mar. 30 Tr. 91). After the police arrived, Richard admitted that he called Timothy his "stupid a** nephew" and that he said: "He [Timothy] knocked me down and I shot him." (Mar. 30 Tr. 81). At trial, Richard also testified that he regretted shooting Timothy. Given this testimony, the jury could have concluded that Richard's use of deadly force was a disproportionate response to being pushed.

{¶43} In summary, we cannot conclude that the State failed to carry its burden of persuasion on the affirmative defense of self-defense. Further, the record contains no indication that the jury lost its way and returned a verdict that was

against the manifest weight of the evidence in concluding that Richard did not act in self-defense. Thus, his manifest weight arguments relating to self-defense are without merit. Accordingly, Richard's first assignment of error is overruled.

*Second Assignment of Error*

**{¶44}** Richard argues that the jury instructions provided by the trial court did not correctly explain the elements of self-defense.

Legal Standard

**{¶45}** "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. "A trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case." *State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, 903 N.E.2d 656, ¶ 10 (3d Dist.). Jury instructions are also to be "appropriate to the facts of the case." *State v. Turner*, 3d Dist. Marion No. 9-04-21, 2004-Ohio-6489, ¶ 35.

**{¶46}** Further, Ohio Jury instructions ("OJI") are not a source of binding legal authority but "are helpful as an example of the generally accepted interpretation" of state law. *State v. Ferguson*, 10th Dist. Franklin No. 07AP-640, 2008-Ohio-3827, ¶ 47, quoting *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ ¶ 97 (Lanzinger, J., dissenting). "Strict compliance with OJI is not mandatory; deviation from OJI does not necessarily constitute error by a

trial court." *State v. Smith*, 12th Dist. Butler No. CA2009-02-038, 2010-Ohio-1721, ¶ 14. Nonetheless, this Court has considered adherence to the wording of OJI to be of some significance in evaluating challenges to jury instructions. *State v. Frye*, 2018-Ohio-894, 108 N.E.3d 564, ¶ 107 (3d Dist.).

**{¶47}** In examining a challenge to a jury instruction, "[t]he relevant principle * * * is not one of abstract correctness, but is whether an instruction—even if a correct statement of law—is potentially misleading." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 52. Thus, an appellate court "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Frye* at ¶ 105, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990). "An appellate court reviewing jury instructions must examine the specific charge at issue in the context of the entire charge, and not in isolation." *Orians* at ¶ 10.

Legal Analysis

**{¶48}** Richard raises two arguments that challenge different portions of the self-defense instruction that the trial court gave at trial. As stated previously, the elements for the self-defense through the use of deadly force are as follows:

> (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he or she was in danger of death or great bodily harm and that the only way to escape was the use of force, and (3) the defendant did not violate any duty to retreat.

*Barker*, *supra*, at ¶ 22.  In his first argument under this assignment of error, Richard argues that the trial court erred in explaining the first element.  The trial court's instruction on this element reads, in its relevant part, as follows:

> The defendant did not act in self-defense if the State proved beyond a reasonable doubt that the defendant was at fault in creating the incident that resulted in the injury.  This element provides that the defendant must not be at fault in creating the situation that gave rise to the affray and is broader than simply not being the immediate aggressor.  The defendant was at fault if:
>
> * * *
>
> The defendant did not withdraw from the incident after creating *or* agreeing to it.

(Emphasis added.)  (Mar. 30 Tr. 207).  Richard asserts that this provision should have read "after creating *and* agreeing to it" rather than "after creating *or* agreeing to it."  (Emphasis sic.)  Appellant's Brief, 19.  However, we note that Richard has not, on appeal, identified any binding legal authority that would support this argument.

{¶49} We turn to examining the consistency of the challenged instruction with the applicable law.  "It is well established that a person cannot provoke a fight *or* voluntarily enter combat and then claim self-defense."  (Emphasis added.) *James*, *supra*, at ¶ 21.  *State v. Eddy*, 3d Dist. No. 1-22-17, 2022-Ohio-3965, ¶ 16; *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 76 (11th Dist.); *State v. Elam*, 12th Dist. Butler No. CA2021-08-016, 2022-Ohio-1895, ¶ 14.  Further, if a person bears fault in an altercation,

his right of self-defense will revive and his actions will be held justifiable upon the ground of self-defense in all cases where he has withdrawn from the affray or difficulty in good faith as far as he possibly can, and clearly and fairly announced his desire for peace.

*State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195, 200 (1978), quoting 1 Wharton's Criminal Law and Procedure, Section 232, at 504-505. Thus, as a general matter, if a person provokes *or* voluntarily enters a fight, that person can revive his or her right to self-defense by withdrawing from that altercation. It follows that a person generally cannot claim self-defense if that person provoked or voluntarily entered a fight and did not withdraw from the altercation.

{¶50} The instruction challenged on appeal is consistent with these principles. In this jury instruction, the trial court was acknowledging that, even if Richard had created or agreed to the fight in this case, he could still have potentially had a valid claim of self-defense if he had withdrawn from the altercation with Timothy. In his arguments on appeal, Richard has not established that the challenged jury instruction contained an incorrect statement of the law. Further, Richard also has not raised an argument that demonstrates that this challenged instruction was misleading or confusing under the facts of this case. Thus, we conclude that this first argument is without merit.

{¶51} In his second argument under this assignment of error, Richard argues that the trial court incorrectly instructed the jury on the duty to retreat. He challenges the following portion of the trial court's jury instructions:

> To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> (A) The defendant was at fault in creating the situation giving rise to Timothy Dewayne Smith being shot; or
>
> (B) The defendant did not have reasonable grounds to believe that he was in immediate danger of death or great bodily harm; or
>
> (C) The defendant did not have an honest belief, even if mistaken, that he was in immediate danger of death or great bodily harm; or
>
> (D) *The defendant violated a duty to retreat to avoid the danger*; or
>
> (E) The defendant used unreasonable force.

(Emphasis added.) (Mar. 30 Tr. 205-206). As an initial matter, we note that, with the exception of adding Timothy's name, the trial court replicated the wording of OJI for self-defense through the use of deadly force. *Ohio Jury Instructions*, CR Section 421.21 (Rev. Nov. 5, 2022).

{¶52} Richard argues that the trial court's mention of a duty to retreat is not in accord with recent changes to Ohio's law on self-defense as set forth in R.C. 2901.09(B). This provision now reads, in its relevant part, as follows:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense * * * *if that person is in a place in which the person lawfully has a right to be*.

(Emphasis added.) R.C. 2901.09(B).[1] This revision redefined when a person has a duty to retreat before using force in self-defense. This revision did not completely eliminate the duty to retreat as an element of self-defense through deadly force in all situations. After the revisions to R.C. 2901.09(B), a person still may not, where applicable, violate any existing duty to retreat before using deadly force in self-defense. Thus, the trial court did not give an incorrect statement of the law by instructing the jurors that a person may not violate any duty to retreat before using deadly force in self-defense.

**{¶53}** Further, we also note that the trial court did not tell the jury that Richard had a duty to retreat in this case. At trial, the State also did not produce evidence or make any arguments that would suggest that Richard had a duty to retreat in this case. Rather, the State argued that Richard was at fault in creating the altercation and that he used disproportionate force by shooting Timothy with a gun in response to being pushed. We considered these arguments under the first assignment of error and concluded that the State did not fail to carry the burden of persuasion on the affirmative defense of self-defense. For these reasons, we conclude that Richard has not demonstrated that this instruction was misleading or confusing under the facts of this case. Thus, this second argument in this assignment of error is without merit.

---

[1] This provision became effective on April 6, 2021. Richard shot Timothy on July 11, 2021.

**{¶54}** In conclusion, Richard has not demonstrated that either of the challenged portions of the jury instructions were incorrect statements of law. Further, he also has not demonstrated that either of the challenged jury instructions were misleading or confusing under the facts of this case. Thus, we cannot conclude that the trial court erred in giving these jury instructions. For these reasons, Richard's second assignment of error is overruled.

### Third Assignment of Error

**{¶55}** Richard argues that the trial court erred in allowing evidence at trial about his prior acts, including the results of the field sobriety tests he performed roughly two hours before he shot Timothy.

### Legal Standard

**{¶56}** Under Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). While other acts evidence may not be used to establish a person's propensity to engage in certain conduct, "'[o]ther acts' evidence may be properly admitted as 'inextricably intertwined' with an offense" or for one of the "legitimate purpose[s]" set forth in Evid.R. 404(B)(2). *State v. Hill*, 5th Dist. Stark No. 2018CA00077, 2019-Ohio-3432, ¶ 49.

> Evid.R. 404(B) only applies to limit the admission of so-called 'other acts' evidence that is 'extrinsic' to the crime charged. *State v. Stallworth*, 11th Dist. Lake No. 2013-L-122, 2014-Ohio-4297, ¶ 37.

> In other words, 'Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged.' *State v. Wainscott*, 12th Dist. Clermont No. CA2015-07-056, 2016-Ohio-1153, ¶ 19, citing *State v. Crew*, 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110, ¶ 99.

*State v. Grant,* 3d Dist. Paulding No. 11-22-08, 2023-Ohio-2720, ¶ 57, quoting *State v. Gawron*, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 43. "When other acts are 'inextricably intertwined' with [an] offense, those acts are said to be intrinsic to the alleged crime." *Stallworth* at ¶ 38, quoting *United States v. Siegel,* 536 F.3d 306, 316 (4th Cir. 2008).

> Other acts 'are inextricably intertwined with a charged crime when they are so blended or connected with the charged crime that proof of one incidentally involves the other, explains the circumstances thereof, or tends logically to prove any element of the crime charged.'

*State v. Crowley*, 2d Dist. Clark No. 2022-CA-59, 2023-Ohio-1764, ¶ 21, quoting *State v. Sinclair*, 2d Dist. Greene No. 2002-CA-33, 2003-Ohio-3246, ¶ 35.

**{¶57}** "Stated differently, * * * 'other acts' evidence is inextricably intertwined with charged conduct when testimony about the other acts is 'necessary to give the complete picture of what occurred.'" *Sinclair* at ¶ 35, quoting *State v. Wilkinson*, 64 Ohio St.2d 308, 318, 415 N.E.2d 261 (1980). "Consequently, a court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense." *State v. York*, 3d Dist. Union No. 14-21-14, 2022-Ohio-1626, ¶ 57, quoting *State v. Ash*, 2018-Ohio-1139, 108 N.E.3d 1115, ¶ 60 (7th Dist.).

**{¶58}** A trial court has broad discretion over the admission or exclusion of evidence. *State v. Risner*, 3d Dist. Logan No. 8-21-47, 2022-Ohio-3878, ¶ 47. Thus, absent an abuse of discretion, a trial court's evidentiary ruling will not be reversed on appeal. *Id*. An abuse of discretion is not merely an error of judgment but is present where the trial court's decision was arbitrary, unreasonable, or capricious. *Sullivan*, *supra*, at ¶ 20. When the abuse of discretion standard is applicable, an appellate court is not to substitute its judgment for that of the trial court. *State v. Thompson*, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 11 (3d Dist.).

Legal Analysis

**{¶59}** The testimony that Trooper Voght provided about the car accident involving Richard and Curtis described events that were inextricably intertwined with the shooting. The timeline established at trial shows that the car accident and the shooting occurred in close sequence. The car accident occurred around 5:02 P.M. on July 11, 2021. The police released Richard to Tiara at 6:30 P.M. Tiara, Timothy, Curtis, and Richard then drove from the area of the accident in Delaware County to Curtis's home in Union County. Within forty-five minutes of his release, Richard had shot Timothy.

**{¶60}** Further, the incident in which Richard shot Timothy cannot be understood without testimony about the earlier car accident. Testimony about this prior incident explains why Curtis was injured; why Timothy was at Curtis's house; why Timothy was angry at Richard; and why Timothy reacted to Richard's

-28-

comments about Curtis's injuries. This testimony also explains why Richard left Curtis's house and went to Martha's house: he was going to meet the tow truck that was delivering the vehicle he had wrecked. Richard's testimony indicates that he obtained a handgun from inside the wrecked vehicle and then returned to Curtis's house.

{¶61} The testimony about the prior car accident also yielded information that "tend[ed] * * * to prove an[] element of the crime charged." *Crowley*, *supra*, at ¶ 21. Richard was charged with the crime of using a weapon while intoxicated. While responding to the car accident, Trooper Voght observed a bottle of black velvet in the wreck. He also testified that Richard was unsteady on his feet and carried the odor of an alcoholic beverage. As a result, Trooper Voght administered several field sobriety tests with Richard.

{¶62} At trial, Trooper Voght testified about Richard's performance during these field sobriety tests. Based on the results of these field sobriety tests, Richard was arrested for operating a vehicle while impaired. Trooper Voght testified that Richard was released into Tiara's custody at 6:30 P.M. and was, at that time, too impaired to drive himself home. Trooper Voght concluded his testimony by saying that a person's blood alcohol level reduces at a rate of roughly 0.015 per hour. Again, subsequent testimony indicates that Richard shot Timothy roughly forty-five minutes after having been released from police custody.

{¶63} In conclusion, the accident formed the immediate background of the later shooting and was inextricably intertwined with the event that gave rise to the charges in this case. *See State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 20. Further, since Richard was charged with the crime of using a weapon while impaired, Trooper Voght's testimony about the field sobriety tests that were administered after the accident related directly to an element of an offense for which Richard was being tried. *Long, supra*, at 617. Thus, we cannot conclude that the trial court abused its discretion by permitting this evidence to be admitted at trial. For these reasons, Richard's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶64} Richard argues that the trial court erred in granting the State's motions in limine in the absence of a hearing and of a response from the Defense.

Legal Standard

{¶65} "A motion in limine 'serves the useful purpose of raising and pointing out before trial, certain evidentiary rulings that the Court may be called upon to make.'" *Harvey*, *supra*, at ¶ 49, quoting *State v. Maurer*, 15 Ohio St.3d 239, 259, 473 N.E.2d 768, 787 (1984). "A ruling on a motion in limine reflects the court's anticipated treatment of an evidentiary issue at trial and, as such, is a tentative, interlocutory, precautionary ruling." *State v. French*, 72 Ohio St.3d 446, 1995-Ohio-32, 650 N.E.2d 887 (1995). "It is not a ruling on evidence * * * [but] adds a procedural step prior to the offer of evidence." *Maurer* at 259. "In deciding such

motions, the trial court is at liberty to change its ruling on the disputed evidence in its actual context at trial. Finality does not attach when the motion is granted." *City of Defiance v. Kretz*, 60 Ohio St.3d 1, 4, 573 N.E.2d 32, 35 (1991). *See State v. Shurelds*, 3d Dist. Allen No. 1-20-35, 2021-Ohio-1560, ¶ 27.

**{¶66}** Rather, finality generally attaches when "the trial court makes its final determination as to the admissibility of the evidence at trial." *Harvey* at ¶ 50, quoting *Kinn v. HCR ManorCare*, 2013-Ohio-4086, 998 N.E.2d 852, ¶ 44 (6th Dist.). Thus, as a general matter, the party that did not prevail on the motion in limine must "seek the introduction of the evidence by proffer or otherwise" at trial in order to prompt the trial "court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal." *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142 (1986), second paragraph of the syllabus. The failure to take the steps required to preserve such an issue for appeal waives all but plain error. *Frye*, *supra*, at ¶ 93 (3d Dist.); *State v. Mobarak*, 2017-Ohio-7999, 98 N.E.3d 1023, ¶ 23 (10th Dist.).

**{¶67}** Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). To establish plain error, the appellant bears the burden of demonstrating that an error constituted an obvious defect in the proceedings that affected his or her substantial rights. *State v. Eitzman*, 3d Dist. Henry No. 7-21-03, 2022-Ohio-574, ¶ 42. "Under the plain error standard, the appellant must

-31-

demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise." *State v. Bradshaw*, 2023-Ohio-1244, --- N.E.3d ---, ¶ 21 (3d Dist.). Appellate courts take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

Legal Analysis

**{¶68}** In this case, the trial court issued a preliminary ruling, granting three motions in limine that were filed by the State. Richard's initial argument asserts that the trial court erred by granting these motions and that his defense was prejudiced by these rulings. We turn to examining the matters addressed in each of these three motions in limine. First, the State filed a motion in limine on October 25, 2021 that sought to exclude a jury instruction on self-defense from trial. However, the trial court ultimately gave a jury instruction on self-defense in this case. Since he received an instruction on self-defense, Richard cannot demonstrate that he was ultimately prejudiced in any way by the trial court's preliminary decision to grant the State's first motion in limine.

**{¶69}** Second, the State filed a motion in limine on March 21, 2022 that sought to exclude the admission of testimony about Timothy's prior acts for the purpose of establishing that he was the initial aggressor. However, the State acknowledged that "a defendant, when arguing self-defense, may testify about

specific instances of the victim's prior conduct known by the defendant, in order to establish the defendant's state of mind." (Doc. 94), quoting *State v. Marsh*, 11th Dist. Trumbull No. 93-T-4855, unreported (Oct. 20, 1995). The State further acknowledged that such testimony about such prior acts is permitted "to show why the defendant believed the victim would kill or severely injure him." *Id.*

{¶70} At trial, Richard chose to testify in his own defense and was permitted to testify about a number of Timothy's prior acts. While on the stand, Richard testified that Timothy threatens to "crack his skull" during most of their arguments and that Martha has had to call the police to their house to intervene in an argument that he was having with Timothy. (Mar. 30 Tr. 29). He also stated that he and Timothy had a verbal altercation the morning of the accident after he unintentionally knocked over Timothy's PlayStation.

{¶71} Richard also indicated that he was aware of several situations in which Timothy behaved violently in the past and was permitted to describe several of these incidents at trial. He testified that Timothy would get into bar fights with his friends. He stated that he had seen Timothy join with another person in attacking and beating a stranger on the side of a road. Richard also reported that, while Timothy was in prison, he beat up another inmate. Since Richard was permitted to testify about these prior acts from Timothy's past, he has not demonstrated that the trial court's preliminary ruling on the State's second motion in limine operated to prejudice the Defense in any way.

{¶72} Third, the State filed a motion in limine on March 22, 2022 that sought the exclusion of any inadmissible hearsay statements that Timothy may have made about the shooting. However, the State did not identify any hearsay statements from Timothy that it was seeking to exclude. In his motion to oppose the State's third motion in limine, Richard also did not identify any hearsay statements from Timothy that he was seeking to introduce at trial. On appeal, Richard argues that the trial court did not allow him to present "admissions from the alleged victim" that would have supported his defense. Appellant's Brief, 26. In response, the State correctly notes that Richard does not, on appeal, identify "what these alleged admissions were" or where "he attempted to admit this evidence and was barred by the court." Appellee's Brief, 24-25.

{¶73} However, on March 28, 2022, Richard filed three motions to oppose the State's motions in limine. The first of these motions argued for a self-defense instruction and included two quotations from Timothy. In the third of these motions, Richard argued against the exclusion of hearsay statements from Timothy but did not include any quotations from Timothy. Since Richard filed these two motions on the same date, we will, for the sake of this analysis, assume that the two hearsay statements quoted in his first motion are the hearsay statements alluded to in his third motion.

{¶74} In the first statement, Timothy apparently stated that Richard was "afraid" of him. (Doc. 104). In the second, Timothy reportedly said that he "was

-34-

definitely looking for a fight, I was tired of him * * * I had enough of him." (Ellipses sic). (Doc. 104). As an initial matter, we note that, on appeal, Richard does not make any argument to establish that these statements are admissible evidence. Assuming that these are the statements that Richard alludes to in his brief, the preliminary ruling on the admissibility of these statements does not amount to plain error under the facts of this case.

{¶75} As to the first statement, we note that the Defense was permitted to introduce extensive evidence about Timothy's reputation in the community at trial. The Defense called Richard's sister, Edna Steberl, as a witness. She testified that Timothy could behave violently and can become angry "very quickly." (Mar. 30 Tr. 8-9). Martha also testified that Timothy is quick to get angry and does not get along with Richard. When asked to describe Timothy's character, Tiara stated that he was a violent, unpredictable thief who is known as a troublemaker in the community. Richard's daughter, Kyra Smith ("Kyra"), testified that Timothy is a scary, violent, unpredictable, and a bully. Kyra also stated that the people in the community are afraid of Timothy because he is "a terrifying person." (Mar. 30 Tr. 103). Further, we have previously discussed Richard's testimony about Timothy's prior behavior and the reasons that he feared him.

{¶76} As to the second statement, we note that the substance of these remarks was communicated during Timothy's trial testimony. He affirmed that he "had enough" of Richard and, for this reason, went outside with the intention of fighting

with Richard. (Mar. 29 Tr. 148). He stated that they agreed to fight because "there's no other way to work a situation out" and affirmed that he had no other way "to resolve this issue." (Mar. 29 Tr. 148-149). Timothy also admitted that he, "out of anger," said he was going to crack Richard's head open "like Curt's was." (Mar. 29 Tr. 140-141).

{¶77} In the face of these facts, Richard has not raised an argument that could establish that he was prejudiced by the exclusion of these statements from trial. The record indicates that an abundance of admissible evidence was introduced at trial that addressed the substance of what these hearsay statements asserted. Much of this testimony came directly from Timothy's trial testimony. Given this other evidence, Richard has not demonstrated how the admission of these out-of-court statements could have changed the outcome of his trial. For these reasons, we cannot conclude that it was plain error for the trial court to grant the State's third motion in limine.

{¶78} Finally, Richard argues that the trial court erred by granting the State's three motions in limine in the absence of a hearing dedicated to the matters contained therein. However, in his brief, he has not directed our attention to any legal authority that would establish that the trial court erred in this process. Further, we have already examined the State's three motions in limine and concluded that the Defense did not suffer any prejudice from these rulings. For this reason, even if the trial court erred as alleged, such error was harmless. *See* Crim.R. 52(A) ("Any

error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). Since Richard has not established that the trial court erred in granting the State's three motions in limine with these arguments, his fourth assignment of error is overruled.

*State's Assignment of Error*

**{¶79}** The State of Ohio argues that the trial court erred by imposing a sentence for only one of Richard's convictions on a firearm specification.

Legal Standard

**{¶80}** "[T]he proper scope of felony sentence review by Ohio appellate courts is set forth in R.C. 2953.08(G)(2)." *State v. Brill*, 2023-Ohio-404, 207 N.E.3d 1274 (3d Dist.), quoting *State v. Redmond*, 6th Dist. Lucas No. L-18-1066, 2019-Ohio-309, ¶ 15. Pursuant to R.C. 2953.08(G)(2), "an appellate court may reverse a sentence 'only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Runion*, 3d Dist. Wyandot No. 16-22-07, 2023-Ohio-254, ¶ 7, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

> Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Sullivan*, *supra*, at ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954).

**{¶81}** Under R.C. 2929.14(B)(1)(b), a trial court is not generally permitted to "impose more than one prison term for multiple firearm specifications 'for felonies committed as part of the same act or transaction.'" *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 198 (3d Dist.), quoting R.C. 2929.14(B)(1)(b). However, R.C. 2929.14(B)(1)(b) also states that an exception to this general rule is contained in R.C. 2929.14(B)(1)(g), which reads as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court *shall impose* on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.)  R.C. 2929.14(B)(1)(g).  Three-year firearm specifications as described in R.C. 2941.145 expressly fall within the scope of R.C. 2929.14(B)(1)(a).

Legal Analysis

**{¶82}** In this case, the jury found Richard guilty of four felony offenses. Three of these offenses are of a kind that are listed in R.C. 2929.14(B)(1)(g). Further, for all four of the felony offenses for which the jurors returned verdicts of

guilty, Richard was also found guilty of an accompanying three-year firearm specification that was charged pursuant to R.C. 2941.145. Thus, based on the verdicts returned from the jury, this case meets the criterion set forth in R.C. 2929.14(B)(1)(g) and falls within the exception set forth therein.

**{¶83}** At sentencing, the trial court concluded that all four felony offenses merged. However, the trial court apparently concluded that the four firearm specifications merged alongside the underlying felony offenses because it only sentenced Richard for one firearm specification. In *State v. Blackburn*, we concluded that R.C. 2929.14(B)(1)(g) directed the trial court to impose sentences for at least two firearm specifications even though all of the underlying felony offenses that carried these firearm specifications had merged at sentencing. *Blackburn*, 2022-Ohio-988, 186 N.E.3d 892, ¶ 43-45 (3d Dist.).

**{¶84}** Subsequently, the Ohio Supreme Court considered the question of "whether an offender must receive separate prison terms [under R.C. 2929.14(B)(1)(g)] for multiple firearm specifications when the criminal offenses to which those firearm specifications are attached have been merged as allied offenses." *State v. Bollar*, --- Ohio St.3d ---, 2022-Ohio-4370, --- N.E.3d ---, ¶ 1.[2] The Ohio Supreme Court answered this question in the affirmative, arriving at the same conclusion that this Court had reached in *Blackburn, supra*, at ¶ 45.

---

[2] *Blackburn* represented the law of our district at the time that Richard was sentenced on May 31, 2022. The Ohio Supreme Court decided *Bollar* several months after Richard was sentenced.

**{¶85}** In the case presently before this Court, the trial court was required to "impose on the offender the prison term specified under [R.C. 2929.14(B)(1)(a)] * * * for each of the two most serious specifications of which the offender [wa]s convicted * * *." R.C. 2929.14(B)(1)(g). In this case, the trial court imposed a prison term for only one firearm specification. As a result, this portion of Richard's sentence is contrary to law. For this reason, we vacate the trial court's sentence to the extent that it merged the two most serious gun specifications. This matter is remanded for the purpose of allowing the trial court to resentence Richard. *See State v. Ross*, 2023-Ohio-1185, 212 N.E.3d 1041, ¶ 63 (9th Dist.). The State's sole cross-assignment of error is sustained.

*Conclusion*

**{¶86}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Union County Court of Common Pleas is affirmed as to the issues raised in the appeal. Having found error prejudicial to the cross-appellant in the particulars assigned and argued, the judgement of the Union County Court of Common Pleas is reversed as to the issue raised in the cross-appeal. This cause of action is remanded for a resentencing hearing.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**MILLER, P.J. and ZIMMERMAN, J., concur.**

**/hls**